"EXHIBIT # 1"

UNITED STATES V. FRANK

354 F3d 910 (8th Cir. 2003)

motion for a downward departure in his sentence under § 5K2.0 of the sentencing guidelines based on assistance that he provided to the government in finding assets. "A decision to deny a downward departure is not reviewable, however, unless the district judge mistakenly believed that he or she lacked the authority to make such a departure." *United States v. Sypolt*, 346 F.3d 838, 841 (8th Cir.2003). In this case, immediately prior to denying the motion, the district judge stated, "I believe I do have the authority under the guidelines to give the relief you seek." We are thus unable to review this decision.

VIII.

[28, 29] The district court calculated the offense levels of the two defendants by reference to the 2000 version of the Federal Sentencing Guidelines Manual, which was in effect at the time that the defendants committed their offenses. Both defendants contend that the district court erred in using the 2000 version of the sentencing guidelines rather than the 2002 version, which was in effect when they were sentenced. We review the district court's application of the sentencing guidelines de novo. *United States v. Comstock*, 154 F.3d 845, 847 (8th Cir.1998). We review a district court's factual findings in support of a sentence for clear error and "reverse only if we are left with the definite and firm conviction that the district court erred." *United States v. Whatley*, 133 F.3d 601, 606 (8th Cir.1998), cert. denied, 524 U.S. 940, 118 S.Ct. 2347, 141 L.Ed.2d 717 (1998).

[30, 31] Section 1B1.11 of the sentencing guidelines provides that the court is to use the guidelines manual in effect on the date that the defendant is sentenced, unless the court determines that this would violate the ex post facto clause of the United States Constitution, in which case it is to use the manual in effect on the date that the offense of conviction was committed. "Because an amendment to a Sentencing Guideline has the potential to increase a defendant's punishment for a crime committed prior to the amendment, 'the ex post facto clause is violated if a defendant is sentenced under the Guidelines in effect at the time of sentencing when those Guidelines produce a sentence harsher than one permitted under the Guidelines in effect at the time the crime is committed.'" *Comstock*, 154 F.3d at 848 (quoting *United States v. Bell*, 991 F.2d 1445, 1452 (8th Cir.1993)). In order to evaluate this objection, then, it is necessary to compare the defendants' potential sentences under the 2000 and 2002 versions of the sentencing guidelines to determine which version results in a harsher punishment.

It was undisputed at both of the defendants' sentencing hearings that their sentences would be controlled by the money laundering guideline, which, out of all the guidelines for the various counts that were grouped together, was the one resulting in the highest offense level. The money laundering guideline, § 2S1.1, was amended in 2001, and the parties dispute whether application of the amended guideline would have resulted in harsher sentences for the defendants than those they received upon application of the 2000 version of the guideline. The resolution of this issue is ultimately dependent upon the actual or intended loss associated with the money laundering, the amount of money laundered, and the applicability of certain sentence enhancements available under the 2002 guidelines but unavailable under the 2000 guidelines.

Under the 2000 guideline, the base offense level for money laundering, as relevant here, was automatically 20. See U.S.S.G. § 2S1.1(a)(2) (2000). Section 2S1.1(b)(2) of the 2000 sentencing guide-

lines provides a scale of offense-level increases to the base offense level depending upon the amount of money laundered. The district court determined that an increase of one level for Mr. Frank was warranted pursuant to § 2S1.1(b)(2)(B), adopting the finding in Mr. Frank's presentence investigation report that he laundered "at least $100,000," which included funds associated with the sale of automobiles, equipment and collectibles and other valuables as well as earned income." The district court thus used an offense level of 21 to sentence Mr. Frank, and an offense level of 20 to sentence Mr. Ahlers (not including the increases for role in the offense and obstruction of justice).

[32, 33] Under the 2002 sentencing guidelines, if the defendant committed the underlying offense from which the laundered funds were derived and the offense level for that offense can be determined, then the base offense level for money laundering is the offense level for the underlying offense. See U.S.S.G. § 2S1.1(a)(1) (2002). In this case, the primary underlying offenses were fraud offenses, and the guideline for these offenses is U.S.S.G. § 2B1.1. Pursuant to § 2B1.1(a), the base offense level is 6. This level is then increased based on a scale of offense-level increases found in § 2B1.1(b)(1) corresponding to the amount of loss. As we have realized in relation to this guideline, "[s]ometimes the computation of loss is complicated." *United States v. Wheeldon*, 313 F.3d 1070, 1071 (8th Cir.2002). The actual loss or intended loss is the greater of actual loss or intended loss. U.S.S.G. § 2B1.1, comment. (n.2(A)) (2002). In determining this loss figure, "[t]he court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference." U.S.S.G. § 2B1.1, comment. (n.2(C))

(2002). Here, the district court determined at Mr. Frank's sentencing hearing that it could "reasonably and conservatively guess that the Defendant's relevant conduct for these instant offenses of conviction involved an intended loss of at least $200,000, but not more than $350,000." Based on this determination, the court found that an increase of 12 levels was warranted pursuant to § 2B1.1(b)(1)(G) of the 2002 guidelines.

[34] We conclude that the district court's determination that the intended pecuniary harm to the government from the fraudulent acts was at least $200,000 was a reasonable estimate. The amount that Mr. Frank owed had grown to over $500,000 by the time of trial. While he had made some minimal payments, there was evidence that he intended to prevent government collection of at least a substantial portion of the money that he owed. The government presented evidence at sentencing that Mr. Frank had concealed assets from the government valued at over $200,000 (including vehicles, bank deposits, and other funds and property), in addition to concealing his ownership of a cottage in Illinois and a property that had been the site of his auto business with a combined value of more than $200,000. The government also presented evidence that Mr. Frank had concealed, in addition to these assets, over $40,000 in cash from the government. While we recognize that some portion of the total sales price of vehicles fraudulently transferred by Mr. Frank is attributable to the purchase price of those vehicles and the expenses of getting them ready to sell, and did not represent a direct "loss" to the government, we do not think that it was necessary for the district court to have determined this figure precisely, as the court's intended loss estimate is sufficiently conservative to account for such expenses. In any event, as we have

previously noted, in reviewing an "amount of loss" estimation in connection with the fraud sentencing guideline, the "loss need not be determined with precision," *United States v. Berndt*, 86 F.3d 803, 811 (8th Cir.1996), and "we are not inclined to allow the defendants ... a credit for money spent perpetuating a fraud," *United States v. Whatley*, 133 F.3d at 606.

The government has also shown that, had the 2002 sentencing guidelines been used, three additional increases that were unavailable under the 2000 sentencing guidelines would have been appropriate. First, § 2S1.1(b)(2)(B) mandates a 2-level increase "[i]f the defendant was convicted under 18 U.S.C. § 1956." Both defendants here were convicted under this statute. Second, § 2B1.1(b)(7)(C) mandates a 2-level increase if the offense involved "a violation of any prior, specific judicial or administrative order, injunction, decree, or process not addressed elsewhere in the guidelines." The conduct at issue here involved the violation of the judgment in the arson case and a seizure order. Third, § 2B1.1(b)(8)(C) mandates a 2-level increase if the offense "involved sophisticated means." "Sophisticated means" is defined in application note 6 to § 2B1.1 as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." *See* U.S.S.G. § 2B1.1 (n.6) (2002) "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities [or] corporate shells ... ordinarily indicates sophisticated means." *Id.* The government presented a great deal of evidence that the defendants attempted to conceal Mr. Frank's assets and income by using other individuals and businesses to conduct business on his behalf, and that a shell entity named "KW Sales" was created to provide cover for income that Mr. Frank earned and did not report to the government. We think that the district court would have credited this evidence

and applied this enhancement had it employed the 2002 sentencing guidelines.

In accordance with these additions to the base offense level, under the 2002 sentencing guidelines the defendants would have had an offense level of 24 (excluding the adjustments for obstruction of justice and role in the offense), which is at least three levels higher than that which they received under the 2000 guidelines. We thus conclude that the district court properly used the sentencing guidelines in effect at the time the offenses of conviction were committed so as to avoid a violation of the *ex post facto* clause. We note that even assuming arguendo that the "actual or intended loss" associated with money laundering fell below the $200,000 lower bound determined by the district court, application of the 2000 sentencing guidelines would have still been appropriate so long as the loss was more than $120,000, which would have resulted in a base offense level of 22 under the 2002 guidelines. *See* U.S.S.G. § 2B1.1(b)(1)(F) (2002).

While Mr. Frank has provided us with arguments relating to the appropriate calculation of the loss value and the applicability of other enhancements available under the 2002 guidelines, Mr. Ahlers has provided in his brief only the following summary argument for applying the 2002 guidelines: "Under the 2000 guidelines for money laundering there is a higher base level than the money laundering under the 2002 guidelines. Thus, it appears that the 2002 guidelines would have produced a shorter sentence for Mr. Ahlers and should have been used." Mr. Ahlers has advanced no arguments relating to the "actual or intended loss" attributable to his conduct or the applicability of other enhancements available under the 2002 guidelines that lead us to believe that the district court resolved these issues incorrectly in calculating his sentence. We thus

affirm the district court's decision to apply the 2000 sentencing guidelines manual to both defendants.

IX.

For the reasons indicated, we therefore affirm the judgments of the district court in all respects.



CAROLINA CASUALTY INSURANCE COMPANY, Appellee,

v.

Alfred BURBACH, Continental Insurance Company, Appellants,

No. 02-3675, 02-3676.

United States Court of Appeals, Eighth Circuit.

Submitted: Oct. 22, 2003.

Filed: Jan. 14, 2004.

**Background:** Insurer sought declaratory judgment that its truckers' liability insurance policy did not provide primary coverage for insured freight loader's liability for injuries sustained by semi-tractor trailer driver while assisting in loading of freight onto trailer. The United States District Court for the District of Minnesota, Joan N. Ericksen, determined that freight loader's commercial general liability (CGL) policy provided primary coverage. Appeal was taken.

**Holding:** The Court of Appeals, Hansen, Circuit Judge, held that truckers' insurance policy, and not freight loader's commercial general liability (CGL) policy or business automobile liability insurance policy provided primary coverage.

Reversed, and remanded.

**1. Insurance** ⚖️ 2285(2), 2761, 2900

Under Minnesota law, truckers' insurance policy, and not commercial general liability (CGL) policy or business automobile liability policy, provided primary coverage to insured freight loader for its liability for injuries sustained by semi-tractor trailer driver while assisting in loading of freight onto trailer, regardless of the parties' insuring intent with respect to the various policies, the "other insurance" clause in the truckers' policy specifically provided primary insurance under the circumstances, and that clause did not conflict with the "other insurance" clauses of the CGL or automobile policies.

**2. Federal Courts** ⚖️ 776

Interpretation of contractual provision in insurance policy is a question of law subject to de novo review on appeal.

**3. Insurance** ⚖️ 2108, 2111(1)

Under Minnesota law, while courts may look beyond language of applicable insurance policies to determine priority of coverage where two or more companies are liable to insured, looking to insuring intent is appropriate only where policies contain conflicting other insurance clauses.

**4. Insurance** ⚖️ 1813

Under Minnesota law, general contract interpretation principles require courts to construe language of insurance policies according to terms the parties have used in order to give effect to intention of the parties as stated in the contract.

**5. Insurance** ⚖️ 1814, 1822

If language in insurance contract is unambiguous, under Minnesota law, terms are to be taken in their plain and ordinary sense so as to give effect to the intention of the parties as it appears from the entire contract.